John R. Gay v. Commissioner.
Gay v. Commissioner
Docket No. 2337-66.
United States Tax Court
T.C. Memo 1968-226; 1968 Tax Ct. Memo LEXIS 73; 27 T.C.M. (CCH) 1104; T.C.M. (RIA) 68226; October 1, 1968. Filed *73 James J. Laughlin, for the petitioner. George K. Dunham, for the respondent. KERN
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in Federal income tax and additions to the tax as follows: Year
Deficiency
Additions to Tax
under Sec. 6653(b),
I.R.C. 1954
1959
$ 459.82
$229.91
1960
1,907.20
953.60
1962
1,543.20
771.60
The determinations of deficiencies were made by responden The determinations of deficiencies were made by respondent on the basis of increases in petitioner's net worth for each of the years 1959, 1960, and 1962 and on the basis of petitioner's cash expenditures for those years. Findings of Fact The parties have filed herein a stipulation of facts. The stipulated facts, including the exhibits attached thereto, are incorporated herein by this reference. Petitioner resides in Washington, D.C., and filed his returns for the taxable years with the district director of internal revenue, Baltimore, Maryland. During all the years pertinent hereto petitioner resided with his wife, Margorie Gay, in an apartment located at 3701 Connecticut Avenue, N.W., in Washington. In his Federal income *74 tax returns for 1959, 1960, and 1962, petitioner gave his address as 2413 18th Street, N.W., and made no reference therein to a wife. He stated herein that his occupation was "Real Estate" carried on under the business name "Biltmore Realty Co." located at 2413 18th Street, N.W., Washington, D.C. In his return for 1959, petitioner reported total receipts from his business of $1,139.46. His business deductions listed for that year, including items for licenses, bonds, advertising and telephone, amounted to a total of $414.78. The adjusted gross income reported by petitioner for that year was $724.68, purporting to represent the net profit from his real estate business. In his return for 1960, petitioner reported total receipts from his business of $1,253.32. His business deductions listed for that year, including items for licenses, bonds, advertising and telephone, amounted to a total of $505.32. The adjusted gross income reported by petitioner for that year was $748, purporting to represent the net profit from his real estate business. In his return for 1962, which was filed after respondent commenced an audit of petitioner's returns for prior years, petitioner reported gross *75 receipts from his real estate business in the sum of $2,657.50. His business deductions listed for that year, including items for telephone, advertising, brokers' licenses, and brokers' bonds, plus $1,100 for attorney fees, amounted to a total of $1,714.57. The taxable income reported by petitioner for that year consisted of the net profit from his real estate business in the sum of $942.93 and rents from properties located at 2413 18th Street, N.W. ($66.13 profit); 2602 University Place, N.W. ($10.95 profit); 2604 University Place, N.W. ($67.21 loss); 1324 Columbia Road, N.W. ($16.48 loss); 1936 Calvert Street, N.W. ($51.01 profit), and 1835 Vernon Street, N.W. ($2.07 loss), in a total net profit amount of $42.33. Thus, the total income reported by petitioner for that year was $985.26. Respondent, having determined that petitioner had failed to maintain adequate books and records from which his correct taxable income could be ascertained, determined petitioner's taxable income for the taxable years on the basis of the increases in petitioner's net worth for each of those years and on the basis of his cash expenditures. The analysis made by respondent of petitioner's net worth is *76 as follows: 1105 STATEMENT OF NET WORTH
OF JOHN R. GAY
YEAR ENDING BALANCES ASSETS
12/31/58
12/31/59
12/31/60
12/31/61
12/31/62
Cash on Hand
$ 500.00
$ 500.00
$ 500.00
$ 500.00
$ 500.00
Cash in Banks:
American Security &
2,420.28
5,172.79
10,590.76
1,423.45
90.92
Trust - Escrow a/c
American Security &
0
0
0
0
309.00
Trust - Regular a/c
Riggs National Bank
189.13
205.98
310.50
421.97
0
Jefferson Federal
4,398.51
5,245.19
6,060.67
6,448.61
0
Savings & Loan
Perpetual Building &
0
0
0
10,000.00
8,500.00
Loan
Suburban Trust
0
0
0
0
319.76
Company
Interstate Building &
0
0
0
0
7,478.89
Loan
AmericanSavings &
0
0
0
0
4,003.03
Loan
Rental Properties:
1936 Calvert St.,
0
16,000.00
16,000.00
16,000.00
16,000.00
N.W., Wash., D.C.
1341 Oak St., N.W.,
6,000.00
6,000.00
6,000.00
6,000.00
6,000.00
Wash., D.C.
2413 18th St., N.W.,
9,000.00
9,000.00
9,000.00
9,000.00
9,000.00
Wash., D.C.
1324 Columbia Rd.,
12,950.00
12,950.00
12,950.00
12,950.00
12,950.00
N.W., Wash., D.C.
2602 University Pl.,
21,500.00
21,500.00
21,500.00
21,500.00
21,500.00
N.W., Wash., D.C.
2604 University Pl.,
0
0
0
10,000.00
10,000.00
N.W., Wash., D.C.
Automobile: 1959
0
0
0
5,085.08
5,085.08
Cadillac Convertible
TOTAL ASSETS
$56,957.92
$76,573.96
$82,911.93
$99,329.11
$101,736.68
LIABILITIES
Mortgages: (and
Property on which
Secured)
Bernadine E. Scherger
$ 0
$14,696.98
$13,938.16
$13,132.87
$12,287.98
- 1936 Calvert
Perpetual Bldg. &
7,239.78
7,003.34
7,469.50
7,295.10
7,053.93
Loan - 1341 Oak
Oriental Bldg. & Loan
8,387.37
0
0
0
0
- 2413 18th
Perpetual Bldg. &
0
12,264.70
11,788.23
11,367.64
11,049.98
Loan - 2413 18th
Perpetual Bldg. &
6,663.19
6,412.79
6,133.87
5,877.00
5,747.92
Loan - 1324 Columbia
Martin I. Isen - 1324
4,785.25
4,492.04
4,180.73
3,897.88
3,510.94
Columbia
Ed Heid - 2602
8,855.90
8,272.51
7,540.49
6,934.99
6,113.50
University
General Ntge. & Loan
3,388.73
2,903.09
2,344.04
1,765.93
1,141.60
Co. 2602 University
T. F. Colvin - 2604
0
0
0
8,000.00
8,000.00
University
Auto Loan - G.M.A.C.
0
0
0
3,808.96
2,380.60
- on 1959 Cadillac
Reserve for
7,349.87
8,796.40
10,516.40
12,414.95
14,441.03
Depreciation - Rental
Properties
TOTAL LIABILITIES
$46,670.09
$64,841.85
$63,911.42
$74,495.32
$71,727.48
Net Worth Balances
$10,287.83
$11,732.11
$19,000.51
$24,833.79
$30,009.20
Less: Net Worth
10,287.83
11,732.11
19,000.51
24,833.79
Balance - Beginning
of Year
Increases in Net
$ 1,444.28
$ 7,268.40
$ 5,833.28
$ 5,175.41
Worth
Add: Adjustment
1,942.17
1,691.13
2,150.45
2,724.31
Corrected Adjusted
$ 3,386.45
$ 8,959.53
$ 7,983.73
$ 7,899.72
Gross Income
Less: Reported
724.68
748.00
712.90
985.26
Adjusted Gross Income
Income Increased
$ 2,661.77
$ 8,211.53
$ 7,270.83
$ 6,914.46
*77 1106 The analysis made by respondent of petitioner's cash expenditures is as follows: Adjustments to the Increase in Net Worth for the Years Indicated Below Years Ended
December 31,
1959
1960
1962
1. Personal Living Expenses
Rent
$2,580.00
$2,640.00
$3,000.00
Attorney's Fees
331.75
205.00
1,325.00
Telephone
236.22
162.90
295.52
Federal Income Taxes Paid
40.00
35.18
35.88
TV Warranty Repair
119.50
119.50
120.50
Auto Expenses
0
0
637.12
Clothing
150.09
188.76
86.09
Vacations
0
0
164.42
Medical
14.00
4.00
12.00
Food
1,560.00
1,560.00
1,560.00
Miscellaneous
260.00
260.00
260.00
Total Personal Living Expenses
$5,291.56
$5,175.34
$7,496.53
II. Less: Net Pay - Margorie Gay *
3,349.39
3,484.21
4,772.22
Adjustment to the Increases in Net
$1,942.17
$1,692.13
$2,724.31
Worth
The parties have stipulated that the figures used by respondent as the year-end balances of the bank accounts and savings and loan association accounts in his net worth analysis are correct. They have also stipulated, in effect, that the cost bases of the "rental *78 properties" used by respondent in his analysis are correct and that the mortgages on these properties listed as liabilities in this analysis are in the correct amounts. They have also stipulated that the figures used by respondent in his analysis as "Reserve for Depreciation - Rental Properties" are correct. While all of these amounts are stipulated, petitioner does not stipulate that he is or was during the taxable years the owner of these properties or accounts. It is also stipulated that a 1959 Cadillac was purchased in 1961 at a cost of $5,085.08 and that the balance due on the purchase price was $3,808.96 on December 31, 1961, and $2,380.60 on December 31, 1962. This automobile was registered in the name of Aimee H. Gay, petitioner's mother, and petitioner does not stipulate that he was the owner of the automobile. Aimee H. Gay is the mother of petitioner. In 1967 she was 89 years old. She suffered from arthritis, diabetes, and "a lot of other things." According to petitioner's testimony, she could not walk and was bedridden. Her husband, petitioner's father, died in 1942. From some insurance which he had, she received $43 a month. This, together with a small amount which *79 she received from property located at 1341 Oak Street, N. W., constituted her entire income. She filed no Federal and no District of Columbia income tax returns for the years 1959 through 1962 and had no automobile driver's license during those years. From 1959 to June 1, 1961, Aimee lived in an apartment at 1922 N Street, N.W., for which the rental was $38.65 per month. The original lease named petitioner as the lessee and he made the monthly payments of the rent. From June 1, 1961, through 1962 Aimee lived in an apartment located in the same building as that in which petitioner and his wife lived, at 3701 Connecticut Avenue, N. W. The rent for that apartment was $85 a month, from June 1, 1961, to September 30, 1961, and $87 from October 1, 1961, through 1962. On at least one occasion the rent for the apartment was paid by petitioner's wife. Because Aimee "was short of funds and needed * * * money for living expenses," the mortgage loan on the Oak Street property was increased during 1960. Petitioner's wife, Margorie Gay, was employed during the taxable years, and subsequently as a nurse at the Washington Hospital Center. She received net pay for the years 1959, 1960, and 1962 in *80 the respective amounts of $3,349.39, $3,484.21, and $4,772.22. She paid the rent on the apartment occupied by her and petitioner during the taxable years. In 1959 the rental on this apartment was $130 a month. It was increased to $140 a month in 1960 and to $143 a month in 1961. In addition, $20 a month was paid for garage space. Margorie also paid for a trip to Europe taken by her and petitioner in 1961 at a cost of at least $1,000. During some or all of the years in question, the petitioner collected rents and paid expenses on slum properties located at 1936 Calvert Street, N.W.; 1341 Oak Street, 1107 N.W.; 2413 18th Street, N.W.; 1324 Columbia Road, N.W.; 2602 University Place, N.W.; and 2604 University Place, N.W., in Washington, D.C., and purchased various articles of furniture and other house furnishings for those properties. The rentals were from individual rooms or small apartments rented by the week to persons, many of whom were described by petitioner in a most unflattering way. Accusations were frequently made that the conditions of the properties were such as to violate the D.C. Housing Code. On or about July 20, 1959, the property at 1936 Calvert Street, N.W. , *81 was deeded by Bernadine E. Scherger to petitioner. Petitioner executed a deed of trust securing the payment of a large portion of the purchase price. The cash paid at settlement, indicated by the settlement sheet, was $704.85 and a check for this amount was drawn on petitioner's account with the American Security & Trust Co., carried in the name of Biltmore Realty Co. Escrow Account. On May 28, 1960, petitioner deeded the property to Fred C. Garland, and on December 2, 1963, Fred C. Garland deeded it to Aimee Gay, mother of petitioner. The deed by petitioner to Fred C. Garland was returnable to Sol Rothbard, petitioner's attorney, and the deed by Garland to Aimee Gay bore the instruction to return after recording to Aimee Gay at petitioner's office address at 2413 18th Street, N.W. The signature of Garland on the latter deed was obviously the signature of an illiterate person and was witnessed by petitioner. In 1949 petitioner acquired by deed the property located at 2413 18th Street, N.W., Washington, D.C. In December 1955 petitioner deeded this property to his mother. There were no documentary stamps on this deed. Petitioner's signature thereon was witnessed by his attorney and *82 a request was noted on the deed that it be returned after recording to petitioner's attorney. This property was sold in 1966 and the proceeds placed in a joint account of petitioner and his mother, Aimee Gay. In February 1958 a deed to the property at 1324 Columbia Road, N. W., was made from Martin Isen to a William J. Griffith, who is identified by petitioner as "a little white boy" who is dead. The deed was prepared by Sol Rothbard, who was petitioner's attorney at the time. In April 1958 the property was deeded from William J. Griffith to Aimee Gay, petitioner's mother. Griffith's signature on this deed was witnessed by petitioner. In July 1959 petitioner's mother deeded the property to William A. Raye. This property was deeded back to Aimee Gay by Raye in October 1963. His signature on this deed appears as "Willom A. Raye" and was witnessed by Rothbard. The deeds from Griffith to Aimee Gay, from her to Raye, and from Raye back to Aimee Gay were all prepared by petitioner's lawyer, Rothbard, and none contained documentary tax stamps. In August 1955, the property located at 2602 University Place, N.W., Washington, D.C. was deeded by Vic Zeve to William J. Griffith. The cover *83 of the deed bore the instruction to return the deed after recording to John R. Gay, 1341 Oak Street. In April 1958 this property was deeded by William J. Griffith to Aimee Gay. This deed was witnessed by petitioner and prepared by his attorney and bore no documentary tax stamps. In July 1959 the property was deeded by Aimee Gay to William A. Raye. In October 1963 William A. Raye deeded the property to Aimee Gay. Both of these deeds were prepared by petitioner's attorney and neither contained documentary tax stamps. On May 28, 1961, the property at 2604 University Place, N.W., Washington, D.C., was deeded by Delphine Dent Smith to William A. Raye. The cover of the deed bore the instructions to return the deed to Biltmore Realty Company after it was recorded. The cash required for this purchase in the amount of $1,495.26 was paid by a check drawn on the petitioner's account at American Security & Trust Co., carried in the name of Biltmore Realty Co. - Escrow Account. In 1963 the building at 2604 University Place was destroyed by fire. The net proceeds of the insurance claim were paid by check to William Raye who, in turn, endorsed the check over to petitioner. Petitioner's endorsement *84 thereon appears as "Biltmore Realty Co. by John R. Gay." In a deed dated October 15, 1963, William A. Raye deeded the property to Aimee H. Gay. His signature on this deed again appears as "Willom A. Raye" and is witnessed by Rothbard, petitioner's attorney. During November and December 1962, and after respondent's agents had begun an audit of petitioner's returns for prior years, petitioner obtained from the District of Columbia "certificates of occupancy" 1108 permitting petitioner to use properties located at 2602 University Place, N.W., 1324 Columbia Road, N.W., 2413 18th Street, N.W., and 1936 Calvert Street, N.W. In 1949 petitioner's mother, as "surviving tenant by the entirety," deeded to him the property at 1341 Oak Street, N. W., Washington, D.C. In December 1955 the property was deeded by petitioner to his mother, Aimee Gay. There were no documentary stamps on this deed. A loan was obtained by Aimee in 1960 secured by a deed of trust covering the property and the net proceeds in the amount of $505.20 were paid by check to Aimee. This check was endorsed by Aimee and was deposited in petitioner's account at American Security & Trust Co., carried in the name of "Biltmore *85 Realty Co. - Escrow Account." Petitioner maintained a checking account at American Security & Trust Co. during each of the years in question. This account was in the name of "Biltmore Realty Company Escrow Account." During the years in question, petitioner deposited in this account practically all of his receipts, including rents collected from the various properties he operated, and used some of the funds therein to pay part or all of the expenses of the properties he operated. Petitioner also deposited salary checks of his wife in this account and also various sums paid to his mother. In addition to this account in petitioner's name, there was another account at American Security & Trust Co. in the name of Aimee H. Gay which was opened in 1962. During the period 1959 through 1961 Aimee had an account in the Riggs National Bank. Both of these were small checking accounts and there is nothing in the record to show that petitioner made any use of them. During 1958 and until October 3, 1961, there was an account in the Jefferson Federal Savings & Loan Association in the name of Aimee H. Gay. On October 3, 1961, this became a joint account of Aimee Gay and petitioner. The balance *86 in this account ($7,062.16) was transferred in July 1962 to an account at Interstate Building & Loan Association in the joint name of Aimee H. Gay and petitioner. In April 1963 this account was closed out by three checks payable to and endorsed by petitioner, one dated April 9 in the amount of $3,000, one April 10 in the same amount, and one April 11 in the amount of $1,856.74. In June 1961 an account was opened in Perpetual Building & Loan Association in the name of petitioner and Aimee Gay "as joint owners, subject to order of either, and balance on death of either to the survivor." The address given for both was petitioner's office address, 2413 18th Street, N.W. The account was opened by a transfer of $2,000 from the account maintained by petitioner at American Security & Trust Co. in the name of Biltmore Realty Co. - Escrow Account. During July and August 1961, four more transfers were made of $2,000 each from the American Security & Trust account to the account at Perpetual. Starting in the latter part of 1962, large withdrawals were made on the account and by January 7, 1963, the account was completely drawn out. In April 1962 petitioner opened an account at American Savings *87 & Loan. In May 1962 this account was changed into a joint account of petitioner and Aimee H. Gay. Several transfers were made to the account from the account maintained by petitioner at American Security & Trust Co. in the name of Biltmore Realty Co. - Escrow Account. In January 1963 the petitioner closed the account at American Savings & Loan by withdrawing the balance then on deposit. In 1962 petitioner opened an account at Suburban Trust Company. In 1961 a 1959 Cadillac convertible was purchased from Capitol Cadillac Olds Co. for $5,085.08 pursuant to a conditional sales contract signed by Aimee H. Gay and was titled in the name of Aimee H. Gay. Petitioner was present at the time of the purchase. Petitioner executed the application for insurance on the vehicle, signing it "Aimee H. Gay by John R. Gay" and indicated thereon that he would be the only operator of the automobile. Aimee H. Gay did not have a license to drive at the time of the purchase and she had not had one prior to that time or since that time. The $800 downpayment called for by the conditional sales contract was paid by a check drawn on petitioner's account at American Security & Trust Co., carried in the name *88 of Biltmore Realty Co. - Escrow Account. Since the time of its purchase petitioner has driven the automobile regularly. The automobile is housed in a garage at 3701 Connecticut Avenue, N. W., where petitioner resides and the fee for the use of the garage is added to petitioner's rent. There were no cars titled to petitioner since the 1109 acquisition of the 1959 Cadillac. Prior to that time, petitioner had a car titled in his own name. Repair bills on the Cadillac were paid by petitioner to Capitol Cadillac Olds Co. during the year 1962 in the amount of $252.62, out of funds held in accounts controlled by him, and he paid $18 to the Automobile Club of America as membership dues during the year 1962. The conditional sales contract covering the Cadillac called for monthly payments of $119. The balance due on it as of December 31, 1961, and December 31, 1962, was $3,808.96 and $2,380.60 respectively. Petitioner paid attorney fees during the years 1959, 1960, and 1962 in the amounts of $331.75, $205, and $1,325, respectively; telephone bills in the amounts of $236.22, $162.90, and $295.52, respectively; Federal income taxes in the amounts of $40, $35.18, and $35.88, respectively; *89 payments for a repair warranty upon his color television set of $119.50, $119.50, and $120.50, respectively; an insurance premium of $78 on an automobile policy covering the 1959 Cadillac automobile in 1962, a payment of $288.50 in 1962 for gasoline, oil, and incidental expenses other than repairs, insurance and automobile club membership in operating the 1959 Cadillac titled in his mother's name; payments for clothing during the years 1959, 1960, and 1962 of $150.09, $188.76, and $86.90, respectively; payments to Edward Snowden for medical services during the years 1959, 1960, and 1962 in the amounts of $14, $4, and $12, respectively; payments during the year 1962 of the sum of $134.42 to Haddon Hall Hotel in Atlantic City, New Jersey, for a weekend there with his mother, Aimee Gay, and the sum of $30 for incidental expenses on the 3-day trip; payment of $1,560 during each of the years 1959, 1960, and 1962 for food, and payments of $260 during each of the years 1959, 1960, and 1962 for various miscellaneous living expenses other than food and clothing. The items of assets appearing in respondent's "Statement of Net Worth," supra, and the amounts thereof, are correctly included therein *90 with the exception of the following three items: the bank account of Aimee in the Riggs National Bank, the bank account of Aimee in the American Security & Trust Co., and the rental property located at 1341 Oak Street, N.W., Washington, D.C. The ownership of these assets was in Aimee rather than in petitioner. Respondent's audit of petitioner's Federal income tax returns for 1959, 1960, and 1962 began in October 1962. After numerous attempts to set an appointment with petitioner to go over his returns had failed to materialize, petitioner finally appeared on November 30, 1962, before the examining revenue agent, accompanied by his attorney, Sol Rothbard. During the course of this interview by the agent, petitioner stated that he was a single person who lived at 2413 18th Street, N. W., Washington, D.C., and that his sole income was from a rent referral business and interest on a personal loan. He explained that his rent referral business consisted of referring, for a fee, prospective tenants to property owners who might have vacant accommodations. The petitioner indicated that these were the only sources of income he had for the years being audited. Petitioner's attorney stated, *91 and petitioner agreed thereto, that the petitioner had just recently opened a bank account at Suburban Trust Co. Aside from this, petitioner stated he had no other bank accounts. Petitioner presented no books and records to the examining agent other than a typewritten monthly summary of his rent referral business and a receipt from the Washington News Co. substantiating an expense of $360 for advertising. Petitioner stated that his regular books and records had been stolen. Later, at the trial herein, petitioner stated that sometime in April of every year agents of respondent called at his office and demanded all of his books and records and that he gave all of his books and records to these unknown agents without asking for or obtaining any receipts, and consistently with this latter explanation for his failure to have books and records, petitioner has made several formal demands on respondent for the return of his books and records. Respondent does not have and has never had petitioner's books and records. On December 19, 1962, the examining agent discovered from third party records that petitioner had an account at American Security & Trust Co. and, on the same day, he contacted *92 petitioner and asked him to provide information on all of his bank accounts. On February 27, 1963, the examining agent attempted to interview petitioner at his apartment at 3701 Connecticut Avenue, N.W., Washington, D.C., but petitioner directed that any further inquiries be made of his attorney, James J. Laughlin. This discussion with petitioner on February 27, 1963, was the last personal contact respondent's agents had with petitioner. Subsequent 1110 attempts to arrange a conference or interview were unsuccessful. Respondent's agents attempted to elicit information from Margorie Gay, petitioner's wife, and from Aimee Gay, his mother, but both of them refused to be interviewed. Neither of them testified at the trial herein. Respondent's examining agents made several attempts to locate William A. Raye, Fred Garland, and William Griffith, but no trace of them could be found. There is no record of any Federal income tax return for the period 1959 through 1962 having been filed by them with the district director, Baltimore, Maryland, no record of a District of Columbia income tax return having been filed by them for the period 1959 through 1962, and no record of a driver's license *93 in the name of William Raye, Fred C. Garland, or William Griffith being issued or outstanding in the District of Columbia for the period 1959 through 1962. Petitioner understated his taxable income for the years 1959, 1960, and 1962 in relatively substantial amounts to be determined herein under Rule 50, and, as a result, there are deficiencies in income tax due from the petitioner for those years. A part of the deficiency in tax for each of the years 1959, 1960, and 1962 is due to fraud on the part of the petitioner. Opinion KERN, Judge: In the briefs filed on behalf of petitioner, two points are made: (1) that, while in the usual litigation before this Court the Commissioner's determination is presumed to be correct and the burden is on the taxpayer to show otherwise, "the rule is different when fraud is alleged" and "[in] such a case the burden is on the respondent," and (2) that a question asked of petitioner by respondent's counsel at the trial herein on cross-examination with respect to whether he had been convicted in the District of Columbia Court of General Sessions of the crime of larceny after trust, when an appeal from his conviction on that charge was, at the time *94 of the trial herein, pending before the District of Columbia Court of Appeals, constituted "error so fundamental that the finding should, for that reason if no other, be in favor of the petitioner," citing Campbell v. United States, 176 F. 2d 45, which held that in a case before a jury the lower court "erred in admitting evidence concerning [a defendant's] conviction when his appeal therefrom had not been determined." The second point may be disposed of quickly by noting that when the question was asked by respondent's counsel, at the trial herein, concerning a prior conviction, petitioner's counsel made a timely objection thereto, which was sustained by the Court, and no answer was made to the question, and by further noting that the trial herein was without a jury. Petitioner's first point is only partially true. With regard to the deficiencies in tax, even though additions to tax on account of fraud were also determined, the determination of respondent is presumptively correct. It is with regard to the issue involving the determination of additions to tax on account of fraud that respondent has the burden of proof. In connection with the deficiencies in tax, *95 we note that the determinations were made by respondent on the basis of increases in petitioner's net worth for each of the taxable years and on the basis of petitioner's cash expenditures for those years. Petitioner makes no specific argument in his briefs to the effect that the use by respondent of the so-called net worth method in the computation of petitioner's taxable income was inappropriate in this case. Assuming that this question is raised by implication in the pleadings or otherwise, we would decide it in favor of respondent. Concededly, petitioner has no books and records for the taxable years. At the time of respondent's first attempts to audit petitioner's returns, he stated to respondent's agent that he had no books and records because they had been stolen. Later, he alleged, and at the trial herein he testified, that his books and records had been taken by agents of respondent. His testimony was that each year in April two men unknown to petitioner but claiming to be Internal Revenue Service agents came to petitioner's office and took away with them every book and record which he kept without any receipt for these books and records ever being given or requested. He *96 also testified that in 1962 he turned over his books and records to the agent of respondent who started the audit in October of that year. This was denied by the agent. He later testified that at the time of his first interview with this agent he had no books and records because they "had been picked up by the agents." Respondent has no record of the receipt of any books and records of petitioner. We do not believe petitioner's testimony. We conclude that respondent was 1111 justified in using the so-called net worth method in computing petitioner's taxable income. See Holland v. United States, 348 U.S. 121; Morris Lipsitz, 21 T.C. 917, aff'd. 220 F. 2d 871 (C.A. 4, 1955). Some of petitioner's testimony on direct examination was to the effect that "the amounts stated in [his] returns * * * are true and correct" and that he has "not understated [his] income at any time." Uncorroborated and self-serving testimony such as this does not overcome the correctness which attaches to the respondent's determination of deficiencies. Louis Halle, 7 T.C. 245, 247-248. Some of petitioner's testimony on direct examination, which was *97 laboriously elaborated on cross-examination, was to the effect that many of the specific asset items set out in respondent's net worth statement were in reality owned by someone other than petitioner. The putative owners suggested by petitioner's testimony with regard to the rental properties were his mother, Aimee Gay, one William A. Raye, one Fred C. Garland, one William J. Griffith, and one Alice Rieffer, with regard to the bank accounts, principally his mother, and with regard to the Cadillac automobile, also his mother. This testimony was frequently evasive and contradicted by other testimony of the witness. We also point out that it was completely uncorroborated. Petitioner testified that his mother purchased with her own funds and was the owner of the Cadillac automobile which cost over $5,000. Petitioner also testified that his mother was over 80 years old, that she suffered from arthritis, diabetes and "a lot of other things;" and that her only income was a small amount from sources which we shall discuss more fully, infra. His mother never had a driver's license. Petitioner admitted that he drove the Cadillac regularly and paid for its upkeep including garage rental. Prior *98 to the purchase of this automobile petitioner had owned a car titled in his name. He disposed of this car shortly before the Cadillac was purchased. We do not believe that Aimee H. Gay purchased this Cadillac automobile with her own funds and was the beneficial owner thereof. We believe and now so find that petitioner purchased this Cadillac automobile with his own funds and was the beneficial owner thereof; and that he had the automobile titled in the name of his mother in order to conceal his ownership of this asset from potential creditors including the United States Government. Petitioner was a slum landlord. The rental properties listed in respondent's net worth statement were slum properties. Petitioner collected the rents from them, paid the expenses thereof including property taxes, paid for repairs thereto and bought the secondhand furniture and equipment which furnished them. He claims that he was only acting as the agent for others who were the real owners and to whom he accounted for the net profit from their operation; and therefore he urges that respondent erred in considering these properties in computing petitioner's taxable income under the so-called net worth method. *99 Petitioner made no effort to obtain the testimony of the persons nominally appearing as the holders of the titles thereto or named by him as having beneficial interests therein, and none testified either in person or by deposition. As of 1963 the titles to these properties were in the name of petitioner's mother. Petitioner's testimony with regard to his participation in the transactions involving the transfers of title to the various properties was evasive and unconvincing. Particularly unconvincing was his testimony to the effect that his mother purchased with her own funds all of these properties (except the Oak Street property) as investments without even seeking or taking his advice with regard to these acquisitions. In explanation of the source of the funds used by his mother in the acquisition of these properties and those used by her in the acquisition of the various accounts standing in her name alone or jointly with petitioner in various banks and saving and loan associations petitioner testified that his mother had saved since his father's death in 1942 $25,000 in currency which she kept in boxes located in her apartment and the various purchases and deposits had been made *100 from this fund. Prior to giving this testimony petitioner had testified that the only income of his mother after her husband's death was $43 a month from some insurance plus small amounts from the Oak Street property and that a mortgage loan on this property was increased during the taxable years because she "was short of funds" and "needed the money for living expenses." We do not believe that any of these properties were purchased as investments by petitioner's mother with her own funds nor do we believe that any other of the putative owners suggested by petitioner's testimony had any beneficial 1112 ownership in the properties in question. To the contrary we have concluded from a careful consideration of the entire record that the evidence herein supports our findings that the rental properties (with the exception of the Oak Street property) and the various accounts in banks and savings institutions (with the exception of the account of Aimee in the American Security & Trust Co. and the Riggs National Bank) belong to petitioner and are properly listed as his assets in respondent's net worth statement. With regard to the Oak Street property it is obvious that petitioner's mother *101 acquired title not as a nominee or "straw man" of petitioner but as the surviving tenant by the entirety upon her husband's death. There is nothing in the record to make improbable petitioner's testimony that he was given title to this property by his mother for a short time to facilitate the obtaining of a mortgage loan secured by this property. During the period 1959 through 1961, Aimee had a small checking account with the Riggs National Bank. In 1962, this account was closed and an account was opened in Aimee's name in the American Savings & Trust Co. There is no evidence showing that petitioner had anything to do with them or made any use of them. We are unable to find that they are properly assets of the petitioner. With regard to the issue of fraud it is our opinion that the record herein amply supports the respondent's determination. In his reply brief petitioner states that while there might be "unquestionably a series of suspicious circumstances," "suspicious circumstances alone do not justify a presumption [sic] of fraud." We believe that there is much more in this case than "suspicious circumstances" and that respondent has borne his burden of proving fraud on the *102 part of petitioner. The evidence affirmatively shows that petitioner consistently understated his taxable income over a period of four years in amounts which were considerable in relation to the taxable income actually reported. That relationship ranged from four to one in one year to ten to one in another. Far from cooperating with respondent's agent in his initial audit petitioner was evasive and untruthful in an attempt to mislead him from the outset of the investigation. Petitioner's assets were held by him in such a manner as to conceal his ownership from his potential creditors, including the Internal Revenue Service, and also to conceal his sources of unreported income. On this issue we decide in favor of respondent. Because of some slight differences from respondent's determination which may arise in the computation of the deficiencies in tax on account of our exclusion of the Oak Street property and the two small bank accounts from the assets of petitioner properly to be used in ascertaining petitioner's net worth. Decision will be entered under Rule 50. Footnotes
*. Gross pay reported as per her returns timely filed.↩